

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

TOM K. STEWART                                    CIVIL ACTION

VERSUS                                            NO: 05-2198-MLCF-SS

JO ANNE B. BARNHART, COMMISSIONER
OF SOCIAL SECURITY ADMINISTRATION

### REPORT AND RECOMMENDATION

Plaintiff, Tom K. Stewart ("Stewart"), seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claim for supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1382(a)(3).

### PROCEDURAL HISTORY

a.   Stewart's First Application for Benefits.

On March 28, 2000, Stewart submitted his first application for benefits. R. 78-80. He stated he became disabled on September 21, 1991. R. 78. He described his disabling condition as bad nerves. He became upset when he was with people. R. 91. On July 13, 2000, the local office of the Commissioner denied this application. R. 50-53. On September 1, 2000, he sought review of this

decision. R. 55. On May 30, 2002, ALJ Willett denied the application. R. 36-47. On June 11, 2004, the Appeals Council denied Stewart's request for review of the ALJ's decision. R. 28-31. Stewart did not seek judicial review of the Commissioner's denial of his first application for benefits.

b.  Stewart's Second Application for Benefits.

On June 27, 2002, Stewart filed a second application for benefits. R. 301-03. He described his disabling condition as nerve problems. R. 307. Benefits were sought from the date of the application. R. 316. On August 28, 2002, the local office of the Commissioner denied the application. R. 289-292. Stewart requested a hearing before an ALJ. R. 293. On November 26, 2004, ALJ Kunderer denied his second application, R. 14-22, and on January 5, 2005, he sought review of the ALJ's decision. R. 13. On April 22, 2005, the Appeals Council denied the request for review of ALJ Kunderer's decision. R. 7-10.

Stewart filed a complaint in federal court on June 13, 2005. Rec. doc. 1. The Commissioner answered on August 22, 2005. Rec. doc. 9. Stewart filed a brief in support of his appeal on November 22, 2005. Rec. doc. 13. The Commissioner filed a memorandum in support of his motion for summary judgment and in reply to Stewart's brief on December 22, 2005. Rec. doc. 14.[1]

Since August 31, 2000, Stewart has had representation by counsel. R. 54.

## STATEMENT OF ISSUES ON APPEAL

Stewart's request for judicial review raises the following issues:

a.  Did the ALJ err in considering medical evidence developed in connection with the administrative adjudication of the first application for benefits?

b.  Did the ALJ err in refusing to order a further consultative examination?

---

[1] Hereafter these two pleadings will be referred to as plaintiff's motion for summary judgment and Commissioner's cross-motion for summary judgment.

    c.      Did the ALJ follow the legal standards for evaluating Stewart's credibility and was there substantial evidence in support of the ALJ's credibility determination?

    d.      Is there substantial evidence in support of the ALJ's finding that Stewart did not meet or equal Listing 12.03 Schizophrenic, Paranoid and Other Psychotic Disorders or Listing 12.05 Mental Retardation?

## THE ALJ'S FINDINGS RELEVANT TO ISSUES ON APPEAL

The ALJ made the following findings relevant to the issues on appeal:

1. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

2. The claimant's paranoia and schizophrenia are considered "severe" based on the requirements in the Regulations, 20 CFR § 416.920(b); Stone v. Heckler, 752 F.2d 1099 (5th Cir. 1985); and SSR 96-3p.

3. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4. The undersigned finds the claimant's allegations regarding his limitations are not totally credible as his testimony was highly goal directed and his demeanor further reduces his credibility.

5. The claimant has the residual functional capacity to perform work at all exertional levels, further limited by mild restrictions in activities of daily living and social functioning; and no restrictions on concentration, persistence and pace.

6. The claimant has no past relevant work (20 CFR § 416.965).

7. The claimant is a 'younger individual' (20 CFR § 416.963).

8. The claimant has a 5th grade education (20 CFR § 416.964).

9. The claimant has the residual functional capacity to perform a significant range of work at all exertional levels (20 CFR § 416.967).

10. There are a significant number of jobs in the economy that he could perform. Examples of such jobs include work as (1) janitor, 16,535 in the state and 1,124,120 nationally; (2) handpacker, 1,504 and 1,171,022; and (3) stock handler, 2,481 and 207,668, respectively.

11. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 416.920(g)).

R. 21.

## ANALYSIS

a. <u>Standard of Review</u>.

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. <u>Newton v. Apfel</u>, 209 F.3d 448, 452 (5th Cir. 2000); <u>Spellman v. Shalala</u>, 1 F.3d 357, 360 (5th Cir. 1993). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971); <u>Newton</u>, 209 F.3d at 452. Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion. <u>Carey v. Apfel</u>, 230 F.3d 131, 135 (5th Cir. 2000). This court may not re-weigh the evidence, try the issues *de novo* or substitute its judgment for the Commissioner's. <u>Id</u>.; <u>Selders v. Sullivan</u>, 914 F.2d 614, 617 (5th Cir. 1990).

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible. See <u>Arkansas v. Oklahoma</u>, 503 U.S. 91, 113, 112 S.Ct. 1046, 1060 (1992). Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it. <u>Villa</u>, 895 F.2d at 1022; <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988). Any findings of fact by the Commissioner that are supported by

substantial evidence are conclusive. Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

To be considered disabled and eligible for disability insurance benefits, plaintiff must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability. 20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (1997). The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity. Id. §§ 404.1520, 416.920; Newton v. Apfel, 209 F.3d at 453; Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 514 U.S. 1120, 115 S. Ct. 1984 (1995).[2] The five-step inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled. Leggett v.

---

[2] The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled. 20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled. Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence. Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated. If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled. Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy. If the claimant cannot meet the demands, he or she will be found disabled. Id. §§ 404.1520(f)(1), 416.920(f)(1). To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns. When the findings made with respect to claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled. Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 (1994) ("Medical-Vocational Guidelines").

Chater, 67 F.3d 558, 564 (5th Cir. 1995).

The claimant has the burden of proof under the first four parts of the inquiry. Id. If he successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing. Greenspan, 38 F.3d at 236; Kraemer v. Sullivan, 885 F.2d 206, 208 (5th Cir. 1989). When the Commissioner shows that the claimant is capable of engaging in alternative employment, "the ultimate burden of persuasion shifts back to the claimant." Id.; accord Selders, 914 F.2d at 618.

The Court "weigh[s] four elements of proof when determining whether there is substantial evidence of disability: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) [her] age, education, and work history." Martinez v. Chater, 64 F.3d 172, 174 (5th Cir. 1995). "The Commissioner, rather than the courts, must resolve conflicts in the evidence." Id.

b.     Biographical Information.

Stewart was born in 1955. R. 78. He only completed the fifth grade and was a special education student. R. 122 and 124. He was married in 1981 and there were four children by the marriage. R. 78-79, 457 and 498. From 1976 to 1991, he worked in a pipe yard. R. 92. After a conviction for rape in 1991, Stewart was incarcerated at the Hunt and Allen correctional facilities. R. 133 and 455. He was separated from his wife in 1999. R. 457. He was released from jail in March, 2000. R. 300. At the time of the hearing before ALJ Willet on his first application, Stewart lived with his grandmother. R. 123.

c.     Testimony at hearing before ALJ Kunderer.

At the time of the second hearing, Stewart was 49 years old. R. 494. He was 6 feet, three

6

inches tall and weighed 240 pounds. R. 495. He could not read or write. R. 494. He began having mental problems when he was young and he was hit on the back of the head by another person. R. 496. In prison he picked up paper, cleaned bathrooms, unloaded trash and hauled it to a dumpster. R. 496. He was not afraid of work. R. 503. He did not work because he did not want to hurt anyone. R. 503.

At the hearing he testified that he saw a man dressed in black with orange skin sitting in a chair pointing a finger at him. R. 496-97. He began seeing little green people with long ears when he went to jail. R. 497. He described them as the bad people. R. 499-500.

The first time he saw a psychiatrist was in jail. R. 497. Since he got out of jail he had not been hospitalized. R. 505. He went to the West Jefferson Mental Health Center about three or four times a year. R. 495. He took his medication as prescribed. R. 502. He did not like to be around crowds. R. 502.

Stewart took Viagra to help his relationship with his girlfriend. R. 497-98. His girlfriend came over to his grandmother's house. R. 498.

Stewart could not walk too fast. R. 498. He needed to stop and rest when he walked. R. 499. He had trouble sitting. R. 499. He took his own bath. R. 500. His brother helped him shave to protect him from cutting himself. R. 500. He fed himself. R. 501. During the day he walked around. R. 501.

He attended the Friendship Club, a mental health rehabilitation center. R. 506. He saw his parole officer every other week at the facility. R. 501. He went to group therapy but he only stayed about ten minutes. R. 503.

His case manager testified that Stewart experienced severe auditory hallucinations and was

very delusional R. 507. He liked to isolate himself. R. 507. He would not sit in a room with too many people. R. 507. He did not complete chores. R. 507. The case manager was not aware that Stewart had a girlfriend who visited him. R. 508. She reported that his ability to visit with a girlfriend was important to the issue of whether his sociability was impaired to the extent that he could not stay in a group for more than a couple of minutes. R. 508-09.

Based on the hypothetical question posed by the ALJ, the vocational expert testified that there were jobs that could be performed by Stewart. R. 510. If Stewart had a marked limitation in his ability to attend and complete tasks and a moderate limitation in his ability to get along with others, he could not maintain any of the jobs. R. 512.

d.   <u>Medical Evidence</u>.

Stewart was transferred to Hunt Correctional Center in September 1992. R. 207. A report by a clinical psychologist noted no mental health history. He reported abusing alcohol and marijuana. There were no suicidal tendencies. He complained of hearing voices at night. His mood was level, his affect was appropriate and his speech was normal. His attitude was manipulative. The impression was malingering. R. 205-06. He was described as very dull, intellectually. R. 206. He did not manifest a serious, treatable disorder. R. 206.

In October, 1992 he was transferred to Allen Correctional Center. He took Haldol and Cogentin. He complained of difficulty sleeping and migraine headaches. He reported hearing voices and seeing green men, which he reported began in 1991. The diagnosis was chronic undifferentiated schizophrenia. A question was noted about his work status. R. 201. Stewart was seen by a psychiatrist about once a month for the next two years. R. 194-200. In October 1994, he reported he was resting well and continuing on medication. He was told to return in ninety days. R. 194.

In 1995 he reported that he continued to see green people, but not as much as he once did. He stated that in the beginning of the year his sleep was disrupted, but by July he was sleeping well. He remained on medication. R. 189. He saw a psychiatrist several times in 1996. R. 179-80 and 182-84. In December 1996, he reported to the psychiatrist that he was still seeing green people running around. The psychiatrist did not believe him, describing Stewart as manipulative by trying to convince the psychiatrist that he was hallucinating. The psychiatrist believed that Stewart was afraid of losing his medications. He was continued on his medications. R. 179.

In 1997, Stewart was seen by a psychiatrist at least seven times. R. 166, 169-171, 173 and 176. In July he began to waffle about seeing green people running around at night, when he was told that he might lose his night job and have to work during the day. The psychiatrist reported difficulty believing his hallucinations, but described his thought processes as chaotic. R. 170. In December, Stewart reported that he was not doing well. He continued to see green people jumping out of the TV. R. 166. He was continued on medication throughout the year. R. 166.

In January of 1998, he reported that he was doing better. His affect was described as bright and his speech was spontaneous. The psychiatrist noted that he looked better than he had ever seen him, but Stewart continued to report seeing green people about a foot high. R. 166. In March of 1998, he reported that he would apply for SSI when he was released in 2000. He continued to improve in 1998. R. 150, 156, 163-64.

In February 1999, he reported the voices in his head had returned. His medication was increased. He was told to return in a week. R. 148. A week later his condition improved and he was back to the baseline. R. 144. In July he reported too much stress. He worked as a walk orderly without set hours. He could be called out at any time. The psychiatrist noted that he needed a job

with regular work and sleep hours. His duty status was changed to indoor light duty with no work after receiving his medication at 5:00 p.m. R. 143. In October, 1999, he reported he was doing well. R. 142. On January 20, 2000, he was noted as stable and doing well. R. 138. The psychiatrist issued a "to whom it may concern" note, dated January 20, 2000, reporting that he had treated Stewart since October 8, 1992. He had a history of auditory hallucinations, which were consistent over the years. He had trials of Haldol, Stelazine and Thorazine. His current medication was Loxitane. His auditory and visual hallucinations were never in complete remission. Cogentin and Trazadone were also prescribed. R. 213.

From March 9, 2000 through October 4, 2004, Stewart obtained treatment from the West Jefferson Mental Health Center ("Center"). On March 9, 2000, a comprehensive adult assessment was conducted. R. 432. The mental status examination described him as doing fairly well, but he complained of auditory and visual hallucinations. R. 442. His appearance was neat and casual; he was alert; sociability was average; eye contact was fair; motor activity was normal; affect was appropriate; thought process was logical; concentration was fair; memory was intact; judgment was fair; and insight was poor. R. 430 and 442. He was described as pleasant and cooperative. His verbal responses were limited to a few words. R. 442. He was described as mildly mentally retarded. R. 430. A May 1, 2000 psychiatric evaluation also described him as mentally retarded with his mood mildly depressed. R. 429.

On June 6, 2000, Stewart returned to the Center. He reported he was doing well although he continued to see and hear little green people. R. 427. On August 1, 2000, he reported hearing voices and seeing green people. He slept most of each day. R. 426. On October 3, 2000, he reported he was doing well. He continued to sleep a lot. He was still seeing green people and

hearing voices. R. 425. On January 8, 2001, he was doing okay except for trouble sleeping. R. 423.

From April 2, 2001 through October 23, 2002, he was seen at the Center about every four to seven weeks. R. 407-22. The note for July 15, 2002 is typical for this period. It states:

> Patient taking medication as prescribed. Eating OK. Sleep varies. Denied depression. Nervous. Denies anger and agitation. Still hearing voices - conversations. Still seeing little green men. Denies paranoia. Denies suicidal/homicidal ideations. Denies any other problems.

R. 411. From January 15, 2003 through October 4, 2004, Stewart was seen at the Center every month. R. 379-97, 400-406, 477-80. Many of these visits were for group sessions. On February 18, 2003, the psychiatrist noted that Stewart had difficulty sleeping and he continued to hear voices. R. 403. An April 15, 2003, the psychiatric update reported similar conditions. R. 400. He continued to report hearing voices and seeing little green people throughout this period.

On December 17, 2003, Stewart reported that he heard voices, but he was able to ignore them. R. 387. On January 20, 2004, he reported he was taking his medicine regularly; he had problems sleeping; he enjoyed the Friendship Club; and he heard voices. R. 386. On February 18, 2004, he was sleeping better, but he still heard voices. R. 385. On March 17, 2004, he reported he could not pay for certain medication. R. 389. On April 21, 2004, he complained that he was not feeling well. His affect was depressed. He was unable to pay for medication for his sore throat. R. 383. On May 21, 2004, he sought copies of his records for his lawyer. It was noted that he was incapable of understanding the correspondence. R. 380. He continued to hear voices. R. 381. On June 21, 2004, he reported that he felt badly since his mother died. He heard voices calling his name. R. 480. On July 26 and August 24, 2004, he reported he was seeing little green people. R. 478-79. On October 4, 2004, he was urged to lose weight. He still heard voices. R. 477.

The medical records include Stewart's treatment at the Medical Center of Louisiana in New Orleans ("Charity") from January 23, 2002 through April 1, 2004. On January 23, 2002, he complained of swollen painful knees. R. 356. On January 30, 2002, he was diagnosed with mild anemia. R. 373. On February 13, 2002, after blood tests, it was reported that he did not have anemia. R. 370-72. On October 28, 2002, he was referred to a dental clinic. R. 363. On November 4, 2002, he reported pain in both knees and there was mild swelling. R. 355. The x-rays did not reveal any evidence of fracture or dislocation. The impression was degenerative changes but no other abnormalities. R. 369. Stewart was told to return as needed. R. 359-60. On December 30, 2002, he complained of pain in a big toe and erectile dysfunction. R. 351. On January 14, 2003, he was diagnosed with leg pain. R. 349. On January 23, 2003, he reported that his eyelids were swollen. He was discharged in good condition. R. 342-45. On January 23, 2003, he returned for a follow-up visit for conjunctivitis. He was told to return as necessary. R. 340-41. On January 30, 2002, he reported that his eye was swollen. R. 464. On April 30, 2003, he reported swelling in his eye. R. 465. On June 2, 2003, he complained of erectile dysfunction and Viagra was prescribed. R. 461. On December 1, 2003, he complained of erectile dysfunction and the Viagra prescription was refilled. R. 459. On February 11, 2004, he complained of diffuse abdominal pain after eating potato chips. He reported seeing green people at night. R. 467. He was told to stop eating potato chips and to take his medication. R. 468. On April 1, 2004, he complained of stomach pains. R. 471. Medication was prescribed. R. 472.

On May 2, 2000, Stewart was evaluated by Richard A. Blocker, Ph.D., a psychologist, at the request of the Commissioner. R. 214-16. Dr. Blocker determined that Stewart was untestable due to malingering. He reported that Stewart related psychotic symptoms that were not credible. He

concluded that Stewart appeared to be malingering.[3] R. 216. On November 14, 2001, Stewart was seen by Carlos Kronberger, Ph.D, clinical psychologist, for an evaluation at the request of the Commissioner. R. 255-58. His impression was that Stewart was probably malingering; he ruled out psychosis; and he noted a probable learning disorder. R. 258. He described Stewart as borderline intellectual functioning. R. 258.

e. <u>Plaintiff's Appeal</u>.

<u>Issue no.1</u>.  Did the ALJ err in considering medical evidence developed in connection with the administrative adjudication of the first application for benefits?

Stewart contends that principles of <u>res judicata</u> barred the ALJ from evaluating medical evidence prior to June 27, 2002, the date of his second application for benefits. This includes all medical evidence from Hunt and Allen correctional facilities, West Jefferson Medical Health Center from March 9, 2000 through June, 2002, Charity from January 23, 2002 through June, 2002, and the consultative evaluations by Drs. Blocker and Kronberger.

Stewart and the Commissioner agree that: (1) principles of <u>res judicata</u> apply to the first application; (2) in the second application Stewart contended he was disabled with respect to an unadjudicated period; and (3) in the second application the ALJ was required to consider the facts and issues <u>de novo</u> in determining disability with respect to the unadjudicated period. From these points of agreement the parties reach opposite conclusions.

Stewart cites <u>Robbins v. Secretary of Health Human Services</u>, 895 F.2d 1223 (8th Cir. 1990),

---

[3] Stewart supplied a letter from the local office of the Commissioner, dated November 14, 2001, in which the Commissioner refused Dr. Blocker's request to resume conducting consultative examinations. As early as May 8, 2000, the Commissioner determined that Dr. Blocker was not following the Commissioner's policy on the scheduling of consultative examinations. The Commissioner also reported that there were some quality issues as a result of the over-scheduling of examinations. R. 489. There is no evidence of a quality issue with Dr. Blocker's report of May 8, 2000. Even if the Dr. Blocker's report was excluded, substantial evidence remains for the ALJ's findings.

for the proposition that medical evidence from a prior hearing cannot be subsequently evaluated in a later administrative hearing. In this per curiam decision, the plaintiff's first application for disability based on a back condition was denied by the ALJ and the request for review was denied by the Appeals Council. The plaintiff did not seek relief in federal court. The plaintiff filed a second claim for disability arising out of the same back condition. On the second application, the ALJ accorded the first decision res judicata effect. The plaintiff contended that her claim for benefits from the date of the denial of the first application until the expiration of her insured status was open for review. The Eighth Circuit found that the plaintiff did not present any new evidence with the second application that her physical condition had changed or deteriorated after the denial of her first application. Instead, she sought to support her claim for benefits based on the medical evidence from the earlier proceeding. The Eighth Circuit held that principles of res judicata prevented the reevaluation of the medical evidence from the first proceeding. It acknowledged an exception for the use of the prior medical evidence as background for new and additional evidence of deteriorating mental or physical conditions occurring after the prior proceeding. Id. at 1224.

Unlike Robbins, Stewart does not argue that his medical condition deteriorated after the denial of the first application. Instead, his brief focuses exclusively on the medical evidence subsequent to the date of the first application. Stewart makes no comparison between his condition before and after the second application. Under Robbins, ALJ Kunderer was permitted to use the medical evidence from the prior application as background. The ALJ was permitted to evaluate the medical evidence from the first application to determine whether there was any change in Stewart's condition after the denial of the first application. The ALJ also was permitted to consider the medical evidence from the first application as it related to Stewart's condition after June 27, 2002.

14

Issue no. 2.   Did the ALJ err in refusing to order a further consultative examination?

Stewart's contention that the Commissioner failed to fully and fairly develop the record is without merit. A comparison of the medical records submitted with the two applications does not demonstrate any deterioration in Stewart's conditions. For example the notes of Stewart's treatment at the West Jefferson Mental Health Center for April 2, 2001 and October 23, 2002 are almost identical. In the absence of any deterioration in Stewart's condition after June 27, 2002, there was no need to order a further consultative examination.

Issue no. 3.   Did the ALJ follow the legal standards for evaluating Stewart's credibility and was there substantial evidence in support of the ALJ's credibility determination?

Stewart contends that the ALJ did not comply with the requirements of Social Security Ruling 96-7P on assessing the credibility of an individual's statements. 1996 WL 374186 (S.S.A.). There is no dispute that it was necessary for the ALJ to make a conclusion about Stewart's credibility. The Ruling requires that the ALJ's decision contain specific reasons for findings on credibility supported by record evidence and sufficiently specific to make clear to the claimant and to any subsequent reviewers the weight the ALJ gave to the claimant's statements and the reasons for that weight. Id. at *3. Stewart argues that the ALJ discredited his testimony primarily because he was not hospitalized for his medical conditions. Stewart urges that hospitalization is neither a requirement for disability nor a reason for a finding on credibility.

The ALJ's decision states that Stewart's assertions concerning his symptoms were exaggerated, inconsistent and lacked corroboration or substantiation. They were not credited. R. 20. The ALJ cited the following reasons for this finding: (1) Stewart was never hospitalized after his release from prison; (2) the evaluation by the non-examining consulting physician indicated that

Stewart had only mild limitations;[4] (3) Stewart's case manager acknowledged that his ability to maintain an intimate relationship with his girlfriend was inconsistent with his inability to stay in a group for no more than a few minutes; and (4) the ALJ's observation that Stewart's testimony that he saw an orange skinned man dressed in black at the hearing was not credited as it conflicted with all of his prior reports of little green men or people. R. 20.

The ALJ's decision demonstrates that he relied on more than a need for a hospitalization to determine Stewart's credibility. Each issue relied upon by the ALJ in support of his finding that Stewart was not credible is fully supported by the record. The ALJ complied with the requirement in SSR 96-7p that the decision contain specific reasons for the finding on credibility which were supported by record evidence.[5]

Issue no. 4.   Is there substantial evidence in support of the ALJ's finding that Stewart did not meet or equal Listing 12.03 Schizophrenic, Paranoid and Other Psychotic Disorders or Listing 12.05 Mental Retardation?

Stewart argues that the ALJ failed to conduct a proper listing analysis and the ALJ's finding that he did not meet or equal any of the listed impairments was not supported by substantial evidence. The ALJ found that the medical evidence supported a finding that Stewart suffered from paranoia and schizophrenia, which were severe impairments. R. 18. Stewart's contention that the ALJ did not conduct a Listing analysis ignores the thorough analysis of Stewart's medical records and the findings in support of the determination that he was not disabled.

Listing 12.03 is characterized by the onset of psychotic features with deterioration from a

---

[4] See Report of August 26, 26, 2002. R. 443-457 at R. 443.

[5] There were reports from the Hunt and Allen correctional facilities that raised issues about his credibility. The clinical psychologist that examined Stewart in September, 1992 on his arrival at Hunt Correctional Center described him as malingering. R. 205-06. In December, 1996 and July, 1997, the psychiatrist at Allen Correctional Center did not believe Stewart's reports of seeing green people running around. R. 170 and 179.

previous level of functioning. The required level of severity for these disorders is met when the requirements in both the A and B criteria are satisfied. 20 C.F.R. part 404, subpart P, app. 1. section 12.03. Stewart contends that the A criteria were satisfied because the medical records demonstrate persistent, either continuous or intermittent, hallucinations and emotional withdrawal. For the reasons discussed under issue no. 2, there is substantial evidence to support a finding that Stewart's complaints of hallucinations and emotional withdrawal were not credible. Assuming that the A criteria were satisfied, the Commissioner contends that the B criteria were not satisfied. In order to satisfy the B criteria, a claimant must demonstrate at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence or pace; or (4) repeated episodes of decompensation, each of extended duration.

Stewart argues that he has marked limitations in maintaining social functioning. This is based on the reports by the case manager at the Friendship Club that he had difficulty being around people and completing tasks in a group setting. The case manager, however, acknowledged that she was unaware of Stewart's intimate relationship of some duration with a woman. She agreed that this relationship was important to determining whether Stewart's social functioning was impaired. R. 508-09. There was substantial evidence to support a finding that Stewart did not suffer from a marked limitation in social functioning.

Stewart also argued that he had marked difficulties in maintaining concentration, persistence or pace. In July 2002, Stewart reported that he was taking his medicine as prescribed. He reported nervousness and problems with sleeping. He continued to hear voices and see little green men. He denied any other problems. R. 411. Eight months later in February, 2003 his condition was

unchanged. The psychiatrist noted that Stewart reported on and off sleeping. The voices were about the same. R. 403. The nurse's note for that date recorded nervousness, the presence of the voices and the concern that someone was watching him. He denied depression or any other problem. R. 403. On April 15, 2003, a psychiatric update was conducted and the physician's notes report that, although Stewart stayed with his grandmother, he wanted help obtaining an apartment. He reported the pendency of his application for SSI benefits. His sleep was "off and on." He did not have problems eating. He reported that he continued to hear voices about the same as previously. He denied that he wanted to rely on others. His medication was continued. The diagnosis, schizophrenia and mild mental retardation, remained unchanged. R. 400. The report does not demonstrate any change or deterioration in Stewart's condition. Dr. Kronberger reported that his attention and concentration were only fair. R. 256. The March 9, 2000 comprehensive adult assessment performed by the West Jefferson Mental Health Center found his concentration was fair. R. 430. There is substantial evidence to support a finding that Stewart did not have marked difficulties in maintaining concentration, persistence or pace.

> Stewart contends that he meets the Listing requirement for mental retardation.
>
> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the development period; i.e. the evidence demonstrates or suggests onset of the impairment before the age of 22.

20 C.F.R., Part 404, App. 1 § 12.05C. Stewart ignores the requirement that the evidence suggest the onset of the impairment before the age of 22. The only evidence concerning his condition prior to age 22 is that he completed only the fifth grade and that he qualified for a special education program. R. 122 and 124. He began working in pipe yard in 1976. R. 92. There is substantial evidence to

support a finding that Stewart's mental retardation did not manifest itself during the development period. Assuming it did, the Listing requires:

> A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant and work-related limitation of function.

20 C.F.R., Part 404, App. 1 § 12.05C. Stewart argues that he was repeatedly diagnosed with mild mental retardation, which is equivalent to an in IQ score of between 50 and 70. The Listing is explicit. A valid verbal, performance, or full scale IQ of 60 through 70 is required, which is not present in the record. There is no provision that a diagnosis of mild mental retardation satisfies the Listing requirement.

In response to the ALJ's hypothetical question, the vocational expert testified that Stewart could perform janitor and cleaning jobs that were available in Louisiana. R. 511. Prior to his incarceration and for nearly fifteen years, Stewart worked in a pipe yard. R. 92. He was in jail for nine years and during that time he performed work similar to that of the janitor and cleaning jobs described by the vocational expert. Stewart testified that he picked up paper, cleaned bathrooms, unloaded trash and hauled it to the dumpster. R. 496. The prison medical records confirmed that Stewart worked in jail. Indeed the prison psychiatrist noted that Stewart needed a job with regular work and sleep hours. R. 143.

There is substantial evidence for the finding that Stewart did not meet or equal Listing 12.03 Schizophrenic, Paranoid and Other Psychotic Disorders or Listing 12.05 Mental Retardation and that there were a significant number of jobs, including work as a janitor, that Stewart could perform.

## **RECOMMENDATION**

Accordingly, IT IS RECOMMENDED that defendant's cross-motion for summary judgment

(Rec. doc. 14) be GRANTED and plaintiff's motion for summary judgment (Rec. doc. 13) be DENIED.

## OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within ten (10) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 18th day of January, 2006.

SALLY SHUSHAN
United States Magistrate Judge